UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| COREY M. HIGGINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:12 CV 1535 DDN |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Corey M. Higgins for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## **I.  BACKGROUND**

Plaintiff Corey M. Higgins, born December 22, 1977, applied for Title II benefits on September 10, 2009.  (Tr. 114-15.)  He alleged an onset date of disability of May 18, 2009, due to learning disabilities, speech impairment, depression, suicidal thoughts, and personality disorder.  (Tr. 176-85.)   Plaintiff's application was denied initially on November 12, 2009, and he requested a hearing before an ALJ.  (Tr. 60-68.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity.  Fed. R. Civ. P. 25(d).

On April 13, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 8-16.) On July 3, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

In October 1983, the Special School District of St. Louis County evaluated plaintiff and diagnosed him with speech and language impairment. Following the evaluation, plaintiff enrolled in an itinerant speech and language program. In October 1984, the school district reevaluated him, diagnosed him with learning disability and language impairment, and placed him into a resource learning disabilities program and resource language program. Following his reevaluation in July 1987, the school district made the same diagnoses and continued him in the programs. (Tr. 269.)

On June 4, 1990, the school district reevaluated plaintiff and noted that his individual education plan goals included improvement of math skills and language content skills. The evaluation indicated plaintiff's moderately deficient and below age-level math skills. The evaluation further indicated plaintiff's above average general language skills but that he continued to suffer from slight deficits in certain areas. The evaluation concluded that plaintiff continued to suffer from learning disability due to his math skills and recommended a math improvement class and continued efforts to meet his individual education plan goals. (Tr. 269-73.)

On April 1, 1992, near the end of his eighth-grade year, the school district reevaluated plaintiff, stating that plaintiff enrolled in regular classes, except for science. He generally functioned at grade level, although he continued to suffer minor difficulties in math. The evaluation concluded that plaintiff did not qualify for the Special School District and terminated his individual education plan. (Tr. 263-68.)

On March 31, 2003, during his service in the Navy, plaintiff attempted suicide by cutting his left wrist with a razorblade. Upon his arrival at a hospital, plaintiff indicated

suicidal intent, and the naval psychiatric personnel evaluated him. On May 30, 2003, plaintiff received an honorable discharge due to personality disorder. (Tr. 414-18.)

On October 11, 2008, plaintiff met with Jennifer Brockman, M.D. He reported that he lived with his parents, although they went on vacation and left the house to him. He indicated that he maintained an active social life and discussed softball and bowling on a weekly basis. He mentioned that he consumed about two beers twice per week. Dr. Brockman diagnosed depression, anxiety disorder, and alcohol abuse. She prescribed Celexa and recommended that he monitor his alcohol consumption.[2] (Tr. 296.)

On April 4, 2009, plaintiff reported that he worked at City Mortgage and that he hoped for a permanent position. He also stated that he continued to play softball and bowl and maintained his alcohol consumption. Dr. Brockman noted that his alcohol abuse was in remission and increased his Celexa medication. (Tr. 294.)

On June 20, 2009, plaintiff reported that his employer terminated him after one year of employment for financial reasons but that he would start a new job at Ultimate Electronics. He reported increased depression but controlled anxiety and that he could leave his house. He continued to bowl and slept well. He also reported that he drank a six-pack of beer per day. Dr. Brockman decreased his Celexa dosage and prescribed Lexapro.[3] (Tr. 289.)

On July 25, 2009, plaintiff reported that he continued to work and bowl and started painting. He further reported that he drank three times per week and that his anxiety was okay. Dr. Brockman noted that plaintiff continued to gloss over negative aspects and falsely report favorable outcomes. She increased his Lexapro dosage and prescribed

---

[2] Celexa is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited April 15, 2013).

[3] Lexapro is an antidepressant used to treat depression and anxiety. WebMD, http://www.webmd.com/drugs (last visited April 15, 2013).

Ativan.[4]   Plaintiff promised Dr. Brockman that he would abstain from alcohol consumption for two weeks. (Tr. 287.)

On August 8, 2009, plaintiff reported that he continued to work and paint. He consumed three beers three times per week when he bowled. He reported that Ativan induced drowsiness without reducing his anxiety. Although he continued to feel nervous during mornings, he reported that his anxiety no longer paralyzed him but he hoped to continue improving his social life. Dr. Brockman instructed plaintiff to abstain from alcohol until his next appointment. (Tr. 285.)

On October 20, 2009, plaintiff reported that he continued to work and bowl and that he began hunting. He continued to consume alcohol in lesser amounts and stated that abstaining from alcohol induced anxiety. (Tr. 284.)

On November 9, 2009, Kyle DeVore, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. Dr. DeVore found the medically determinable impairments of attention deficit hyperactivity disorder (ADHD), learning disability, depression, and chronic alcohol abuse. Dr. DeVore also found that plaintiff suffered mild restrictions with daily living activities, moderate difficulties with maintaining social function, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 305-16.)

On November 9, 2009, Dr. DeVore also submitted a Mental Residual Functional Capacity Assessment. Dr. DeVore found that plaintiff suffered moderate limitations with his ability to interact appropriately with the general public and his ability to accept instruction and receive criticism from supervisors. He found plaintiff's credibility marginal and that plaintiff could perform moderately complex work tasks with limited social interaction. (Tr. 317-19.)

On November 13, 2009, Dr. Brockman submitted her opinion regarding plaintiff's status as a disabled person. She treated plaintiff for over a year, and he experienced

---

[4] Ativan is used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited April 15, 2013).

- 4 -

lifelong symptoms of anxiety and depression exacerbated by stress. She noted that he had not received more extensive testing due to lack of insurance. He required extensive assistance from his parents. He had previously suffered suicidal ideation and severe isolation. She opined that he could not tolerate or maintain employment due to his cognitive impairments and mood and anxiety symptoms. Although his medications helped, he continued to suffer limitations. Dr. Brockman noted that plaintiff occasionally drank to alleviate anxiety but that alcohol was not the primary cause of his impairments. He minimized symptoms. He continued to express anxiety, but his depression improved with treatment. (Tr. 320.)

Dr. Brockman stated that plaintiff would likely miss more than three workdays per month due to his impairments, symptoms, and treatments. She stated that plaintiff could not live without parental support and required prompting for daily living activities. She opined that he could not function on the open job market and that his condition was unlikely to change. She diagnosed depression, anxiety, and learning disability, indicated that alcohol abuse should be considered, and gave a GAF score of 50.[5] (Tr. 320-21.)

On December 13, 2009, Kevin Schuler, Ph.D., performed a psychological evaluation on plaintiff. He performed several tests on plaintiff and diagnosed depressive disorder with anxiety and obsessive-compulsive features and cognitive disorder. He found that plaintiff suffered from a significant cognitive deficit in his right cerebral hemisphere manifested by difficulty with working at a theoretical level or with arithmetic, attention, and visual tasks. Stress also exacerbates plaintiff's mental condition, which results not only from external stressors but from coping with his mental impairments. His obsessive-

---

[5] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

compulsive tendencies manifest by attempting to blend socially, which explains his unrealistic optimism regarding his mental condition and his efforts to minimize his symptoms and his inability to cope.  Dr. Schuler noted that his efforts to appear socially outgoing, seek employment, and minimize his condition were generally uncommon among those seeking disability benefits.  (Tr. 326-29.)

On January 29, 2010, plaintiff reported that he continued to bowl and drink.  Dr. Brockman prescribed Vivitrol and ordered lab tests but indicated concern regarding the cost.[6]  (Tr. 410.)

On April 28, 2010, plaintiff reported that he continued to bowl and drink and that he planned to attend a baseball game with friends.  Dr. Brockman noted plaintiff's ineligibility for patient assistance program, which would have funded his Vivitrol prescription, and prescribed Naltrexone.[7]  (Tr. 406-09.)

On May 26, 2010, plaintiff reported decreased alcohol consumption and that he continued to work and bowl.  He stated that his parents planned an out-of-state trip.  Dr. Brockman noted that she received his lab results.  (Tr. 404.)

On September 14, 2010, plaintiff reported that he continued to bowl and began exercising.  He planned a two-week trip to New York City to visit Niagara Falls and the Baseball Hall of Fame.  He reported drinking once per week when bowling.  Dr. Brockman considered plaintiff to be a poor historian.  She opined that his anxiety limited his performance and that medication would not help, that he was unable to work even with

---

[6] Vivitrol is used to treat alcohol abuse.  WebMD, http://www.webmd.com/drugs (last visited April 15, 2013).

[7] Naltrexone is the generic term for Vivitrol.  WebMD, http://www.webmd.com/drugs (last visited April 15, 2013).  The record is unclear regarding the distinction between the Vivitrol that plaintiff could not obtain due to lack of funding and the subsequently prescribed Naltrexone, although one might infer from the record a generic-name brand distinction or a difference in the mode of ingestion.  (Tr. 406, 409.)

treatment, and that he required assistance from his parents with daily living activities. She gave him a GAF of 40.[8] (Tr. 403.)

**Testimony at the Hearing**

The ALJ conducted a hearing on October 26, 2010. (Tr. 21-53.) Plaintiff testified to the following. Plaintiff lives in a house with his parents and receives unemployment benefits. His parents often leave him alone at the house. He cannot work due to difficulty concentrating and has not sought work. After some discussion with the ALJ regarding the inconsistency between receiving unemployment benefits and applying for disability, plaintiff stated that he applied at Lowe's and Home Depot for a stocker position seven or eight months earlier. He performs work around his home and has been learning to paint. He seeks yard work and construction jobs and, specifically, mowing and painting jobs. (Tr. 24-27, 31.)

In the Navy, he performed as a boatswain mate by mopping, sweeping, painting, standing watch, and working in the cafeteria. He served for a year and a half before receiving an honorable discharge. In elementary and high school, he enrolled in special education courses for science, social studies, and math. He attended college for four years, took general education courses, and received an associate's degree in general studies. In 2009, he worked for Intel Staff Health Care and Staffing Solutions through a temp agency and performed as a file technician with both employers. As a file technician, he scanned documents with a handheld scanner and filed them but performed no computer work. At St. Anthony's Medical Center, he performed as a central supply clerk. He currently works on his own landscaping and performing yard work. (Tr. 28-29, 31.)

---

[8] A GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). DSM-IV-TR at 32-34.

- 7 -

At home, he launders almost daily, sweeps his entire two-story house, and cleans his room.  His mom typically prompts him to perform his household chores.  He also mows the lawn on a weekly basis but his father advises him on when to mow.  He requires no prompting to maintain his personal hygiene.  He owns a car, possesses a credit card, and maintains a bank account, which is also in his mother's name.  He needs reminders to pay bills and often forgets to pay.  (Tr. 32-35.)

He struggles with alcohol.  His last drank alcohol the previous day.  He sees psychiatrist Dr. Brockman.  Dr. Brockman has not discussed with him treatment for alcohol abuse.  He takes medication, which helps, but he continues to suffer anxiety and depression.  The ALJ noted that plaintiff bowled, attended baseball games, planned a trip to New York, and continued to drink.  Plaintiff testified that he has received warning regarding consuming alcohol while taking psychiatric medications, but abstaining from alcohol is difficult.  (Tr. 35-38.)

In the Navy, plaintiff attempted suicide by slitting his wrists but has had no suicidal thoughts since his discharge.  Depression occurs daily and Lexapro causes tiredness.   He naps every afternoon for about two hours.  (Tr. 39-40.)

Plaintiff's mother Gloria Higgins also testified at the hearing.  She lives with plaintiff and his father.  She is retired and typically spends most of the day around the home.  She constantly watches plaintiff.  (Tr. 41.)

She often instructs him to change clothes due to wrinkles or poor fit.  She inquires as to whether he showered every day, and, on one recent occasion, he lied about showering and refused.  He can operate a microwave but often leaves it messy.  She reminds plaintiff about his finances and regularly monitors his account.  She does not send plaintiff alone to shop for groceries, because he feels apprehensive about the grocery store and refuses, although he goes when she accompanies him.  (Tr. 41-43.)

Plaintiff currently participates as a substitute on a bowling team for mentally disabled persons.  Sometimes he will sleep instead of attending his weekly bowling event. He enjoys baseball, which his parents encourage.  He plans on bowling the next night with

a friend, but his mother anticipates that he will change his mind.  She leaves him alone for out-of-town trips, but her other sons live nearby and look after him.  He exercises in the basement.  His parents accompanied him to New York, and he can travel when accompanied with his parents.  (Tr. 43-45.)

On trips, he talks constantly to strangers, which is often perceived as socially inappropriate.  His parents encourage him to be friendly due to his introverted nature as a child.  His parents do not keep liquor in the house, because he will drink it.  He sneaks out of the house to buy beer.  Drinking allows him to feel more confident.  His mother last saw him drink two nights earlier.  He has not received alcohol rehabilitation due to lack of insurance.  He does not qualify for care from the veterans' hospital due to his short term of service in the Navy.  (Tr. 45-47.)

In his search for a job, he calls employers and applies online.  He can no longer find work through temp agencies.  He requires constant work supervision.  His mother watches him takes his medication every day, except when his parents leave town.  (Tr. 47-48.)

**C. VE Correspondence**

On December 30, 2010, Vocational Expert (VE) Delores Gonzales responded to an inquiry propounded by the ALJ.  The ALJ asked whether plaintiff could perform past relevant work and indicated that plaintiff suffered moderate restrictions regarding concentration, persistence, and pace, could understand, remember, and perform at least simple instructions and non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, adapt to routine or simple work changes, take appropriate precautions to avoid hazards, and perform work without production quotas at normal pace.  The VE responded that plaintiff could perform work as a landscape laborer, which is heavy work with 859,960 positions nationally, 14,540 positions in Missouri, and 7,380 positions in the St. Louis metropolitan area.  (Tr. 260-62.)

On February 17, 2011, the VE responded to an inquiry propounded by plaintiff's counsel.  Plaintiff's counsel presented a hypothetical individual with plaintiff's age, weight, height, education, and work experience, who could only occasionally interact with co-workers and the general public, would miss more than three workdays per month, and had a GAF score between 40 and 50.  The VE responded that such individual could perform no work in the national economy.  (Tr. 258-59.)

### III. DECISION OF THE ALJ

On April 13, 2011, the ALJ issued a decision that plaintiff was not disabled.  (Tr. 8-16.)  At Step One of the prescribed regulatory decision-making scheme,[9] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, May 18, 2009.  At Step Two, the ALJ found that plaintiff's severe impairments were borderline intellectual functioning, ADHD, and alcohol abuse disorder.  (Tr. 10.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments.  (Tr. 10.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels but limited him to work requiring him to understand, remember, and perform only simple instructions and non-detailed tasks.  The ALJ further found that plaintiff demonstrated adequate judgment for simple work-related decisions, could adapt to routine work changes, take appropriate cautions to avoid hazards and perform work at a normal pace without production quotas.  At Step Four, the ALJ found plaintiff able to perform past work as a landscape laborer.  (Tr. 12-15.)

---

[9] See below for explanation.

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Pate-Fires, 564 F.3d at 942.  If

the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that (1) the ALJ erred by improperly discounting the opinions of treating physicians Dr. Brockman and Dr. Schuler, and (2) the ALJ's question posed to the VE did not reflect the RFC determination.

### A. Opinions of Dr. Brockman and Dr. Schuler

Plaintiff argues that the ALJ erred by failing to properly accord the opinions of Dr. Brockman and Dr. Schuler great weight.

"[A] treating physician is normally entitled to great weight." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).  However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id.  Further, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009); Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005).

The ALJ found that Dr. Brockman's opinion regarding plaintiff's ability to work was inconsistent with her treatment notes and plaintiff's testimony regarding his ongoing landscaping work. (Tr. 14.)  Dr. Brockman opined on two occasions that plaintiff was disabled. (Tr. 320-21, 403.)  However, her treatment notes indicate that plaintiff's mood and affect were generally euthymic, that he led an active social life, including bowling and attending baseball games, that he maintained employment, that his anxiety and depression were generally controlled, and that his parents left him home alone. (Tr. 284-98, 403-13.)

Plaintiff also testified that he continued to perform as a landscaper. (Tr. 29.) Further, plaintiff drives alone and possesses a credit card. (Tr. 34-35, 202.) Substantial evidence supports the ALJ's decision to give Dr. Brockman's opinion less than great weight.

Plaintiff also argues that the ALJ failed to mention Dr. Schuler's opinion that "[plaintiff's] actual capacity to keep a job or consistently perform a task appears markedly disrupted." (See Tr. 327.) The ALJ did not mention the opinion. However, the ALJ referred to other portions of Dr. Schuler's evaluation (Tr. 13, 14), and one might reasonably infer that the ALJ considered and rejected the opinion. See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). The evidence supporting the ALJ's decision to discredit Dr. Brockman's opinion similarly supports the decision to discredit Dr. Schuler's opinion.

The ALJ did not err by declining to give the opinions of Dr. Brockman and Dr. Schuler great weight. Accordingly, plaintiff's argument is without merit.

**B. Hypothetical Question**

Plaintiff argues that the ALJ's question posed to the VE did not reflect plaintiff's RFC because the ALJ omitted the limitations that plaintiff could only occasionally interact with co-workers and the general public and would miss more than three workdays per month.

Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the "concrete consequences" of those impairments. Id.

Regarding the limitation that plaintiff could only occasionally interact with co-workers and the general public, the ALJ determined that plaintiff suffered from a mild limitation with social functioning but did not include the limitation in the RFC determination. (Tr. 12, 14.) Plaintiff relies on Dr. DeVore's finding that he suffers

moderate difficulties with maintaining social function and moderate limitations with his ability to interact appropriately with the general public and his ability to accept instruction and receive criticism from supervisors. (Tr. 313, 318.) However, the ALJ discounted Dr. DeVore's opinion due to plaintiff's social activities as mentioned above. (Tr. 14.)

The ALJ did not include in the RFC the limitation that plaintiff would miss more than three workdays per month. Plaintiff argues that the ALJ erred with this omission, relying solely on Dr. Brockman's opinion. (Tr. 321.) However, as stated above, the ALJ validly discounted Dr. Brockman's opinion, and no other medical source in the record suggests that plaintiff suffers from such a limitation.

Plaintiff also argues that the ALJ's question is internally inconsistent as it describes plaintiff as moderately limited in concentration, persistence, and pace, and as able to perform work at a normal pace without production quotas. However, plaintiff frames the ALJ's question too narrowly. The ALJ also described plaintiff as capable of understanding, remembering, and performing at least simple instructions and non-detailed tasks, adequate judgment to make simple work-related decisions, and adapting to routine or simple work changes. (Tr. 255.) In essence, the ALJ described plaintiff as moderately limited in concentration, persistence, and pace and as able to perform only simple work at a normal pace without production quotas, which presents no inherent conflict.

The ALJ accepted as true plaintiff's mild limitation with social functioning but did not include it in his question to the VE. In some circumstances, the failure to present a VE with all relevant impairments is reversible error. However, significantly, the ALJ's decision proceeded only to Step 4, where the claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. Therefore, the ALJ need not rely on VE testimony. Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996). Rather, plaintiff must show that, given his mild limitation with social functioning in addition to the impairments contained in the RFC determination, he cannot perform work as a landscape laborer. Plaintiff does not make this argument nor does the record support it. Accordingly, plaintiff's argument is without merit.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on May 20, 2013.